**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| In re: | § | **Case No. 09-12837 (CAG)** |
| | § | |
| **U-FIRST, LLC,** *et al.* | § | **Chapter 11** |
| | § | |
| Debtors | § | **Joint Administration Requested** |

**DEBTOR'S EMERGENCY MOTION FOR AN ORDER AUTHORIZING
DEBTORS TO PAY AND HONOR PREPETITION WAGES,
COMPENSATION, AND EMPLOYEE BENEFITS PROGRAMS**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

U-First, L.L.C. ("U-First"), D. Hendrix, LLC ("DH"), and J&J Powermart, LLC ("J&J") (collectively, the "Debtors") file this *Emergency Motion For an Order Authorizing Debtors to Pay and Honor Prepetition Wages, Compensation and Employee Benefits Programs* (the "Motion") and in support thereof respectfully represent:

**NATURE OF THE EMERGENCY**

1.      Pursuant to a separate motion filed contemporaneously herewith, the Debtors have requested an expedited hearing on the Motion for 9:30 a.m. on Friday, October 9, 2009. Expedited consideration is necessary because the Debtors' employees are owed wages for periods prior to the Petition Date, including, in some cases, wages that were ostensibly paid by the Debtors on Friday, October 2, but the checks for which were dishonored as a result of the Debtors' chapter 11 filings.  If the Debtors are unable to replace these dishonored checks, or if Debtors are unable to pay the prepetition portion of their next payroll, the employees will undergo considerable hardship, and the estates will directly suffer from the resulting drop in employee morale, productivity, and retention.

## JURISDICTION AND VENUE

2.        This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3.        Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.        On October 5, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11, Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas, Austin Division (the "Bankruptcy Court").

5.        The Debtors continue to operate their respective businesses and manage their assets as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed, and no official committee of creditors has yet been formed.

## GENERAL BACKGROUND

### A.        History of the Debtors

6.        U-First was formed in 1996 by William Stewart and James Powers for the purpose of purchasing, owning and operating a package of ten (10) Popeye's Chicken and Biscuits restaurants.  From 1996 to 2000, U-First added an additional five (5) Popeye's restaurants and a handful of other commercial interests.

7.        In October 2002, in response to an economic downturn and various disagreements among the principals, U-First underwent a corporate reorganization (the "2002 Restructure Transaction") through which the fifteen Popeye's restaurants owned by U-First were broken up into three groups of five (5) restaurants each, and sold to three new entities: (i) DH, a company

formed by Dallas Hendrix; (ii) J&J, a company formed by James Powers; and (iii) G. Kelly, LLC, a company formed by Greg Kelly, who at the time was U-First's Director of Operations.

8.  DH closed one of its stores in 2003, but continues to operate four of the restaurant locations purchased from U-First in 2002 (one of which had been destroyed by fire prior to the sale and was subsequently rebuilt by DH).  The restaurant locations currently operated by DH (collectively, the "DH Stores") are as follows:

| Store # | Location |
|---------|----------|
| 2077 | 1823 Airport Blvd., Austin, Texas 78702 |
| 2815 | 9815 N. Lamar, Austin, Texas 78753 |
| 3185 | 1008 N. IH-35, Round Rock Texas 78681 |
| 4236 | 1702 W. Pecan, Pflugerville, Texas 78660 |

9.  J&J sold one of its stores in April 2005, but continues to operate four of the restaurant locations that it purchased from U-First in 2002.  These locations (collectively, the "J&J Stores") are as follows:

| Store # | Location |
|---------|----------|
| 2261 | 3652 Bee Caves Road, West Lake Hills, Texas 78746 |
| 2585 | 516 W. Oltorf, Austin, Texas 78704 |
| 3284 | 9718 Manchaca Rd., Austin, Texas 78748 |
| 5590 | 2320 E. Riverside Drive, Austin, Texas 78747 |

10.     U-First no longer has any business operations, but for historical reasons it remains the named tenant on the real property leases for certain of the DH Stores and certain of the J&J Stores.

**B.     Capital Structure; Management; Results of Operations**

11.     All of James Powers' interest in U-First was transferred to Dallas Hendrix in connection with the 2002 Restructure, and all of William Stewart's interest in U-First was transferred to Dallas Hendrix in 2006.  Also in 2006, Mr. Powers sold 100% of his membership interest in J&J to DH.  Accordingly, J&J is a wholly-owned subsidiary of DH, and all three of the Debtors are wholly owned (directly or indirectly) by Dallas Hendrix.

12.     Mr. Hendrix has won numerous awards from AFC Enterprises, Inc., the national franchisor entity for Popeye's Chicken and Biscuits ("Popeye's Corporate"), for stores under his control.  In both 2006 and 2007, one of his stores won the Silver Plate award, one of only five national awards given out by Popeye's Corporate.  He has also won numerous "Million Dollar Awards," which recognize franchises (individual store locations) that exceed $1 million in annual sales.

13.     DH and J&J (collectively, the "Operating Companies") employ approximately 200 people in the greater Austin area, and the stores they operate represent all or nearly all of the Popeye's restaurant locations within that area.

14.     Through the first five months of 2009, the Debtors had combined revenue of more than $3.2 million, and net income of approximately $170,000.[1]

---

1 Net income figure does not include depreciation or amortization.

## C.    Prepetition Secured Creditors

15.    U-First is indebted to GMAC U-First, LLC ("GMAC") pursuant to three enterprise loans that were originally extended to U-First in 1998.  The current principal balance of the subject loans is approximately $2.9 million.  GMAC asserts a security interest in substantially all of the assets of U-First, including accounts receivable and other cash collateral.  On information and belief, GMAC also asserts a security interest in certain of the assets of DH and J&J that were transferred to those entities by U-First in connection with the 2002 Restructure.

16.    J&J is indebted to Security State Bank & Trust Company ("Security State Bank") in the amount of approximately $43,000.00.  Security State Bank asserts a security interest in J&J's inventory, equipment, furniture, and other specific assets.

17.    According to the public records, Wells Fargo Bank, N.A. ("Wells Fargo") may assert a security interest in the equipment, tools, and other hard assets of DH relating to or used in connection with Store #4236.  The Debtors believe that any secured indebtedness to Wells Fargo has been paid off.  Although DH does have an outstanding line of credit with Wells Fargo with a principal balance of approximately $14,500.00, the Debtors believe that this indebtedness is unsecured.

## D.    Events Leading to the Bankruptcy Filing

18.    On September 4, 2009, Capmark Finance, Inc. ("Capmark"), as servicer for GMAC, filed a lawsuit against the Debtors and others in the United States District Court for the Western District of Texas, alleging, among other things, that (i) U-First was indebted to GMAC for approximately $2.9 million plus interest and other charges, pursuant to three enterprise loans that were extended to U-First in 1998; and (ii) the Operating Entities—who had purchased assets

from U-First in connection with the 2002 Restructure Transaction—had converted Capmark's collateral for the subject loans. Shortly after the filing of the lawsuit, Capmark filed a motion for appointment of a receiver on similar grounds.

19.     Around the same time, Capmark and GMAC instituted nonjudicial foreclosure proceedings against certain of the Debtors' leasehold interests and related personal property, pursuant to leasehold deeds of trust in GMAC's favor. The foreclosure auction was set to take place on Tuesday, October 6, 2009.

20.     Faced with the imminent and irreversible harm that would result from the appointment of a receiver and/or the loss of their leases, the Debtors filed voluntary petitions for relief under Chapter 11 on October 5, 2009.

**E.      Prepetition Wages**

21.     As of the Petition Date, the Operating Entities employed approximately 200 persons. The employees are paid every two weeks, on Friday, for wages accrued through the preceding Sunday. The Operating Companies' combined gross biweekly payroll obligation is roughly $84,359.27, plus associated payroll tax matching obligations of approximately $6,227.00.[2]

22.     The Debtors' last prepetition payroll date was October 2, 2009, the Friday immediately preceding the Monday that is the Petition Date.[3] On Tuesday, October 6, 2009 the Debtors, in compliance with guidelines promulgated by the Office of the United States Trustee, closed the bank accounts from which the prepetition payroll checks were issued and replaced them with new debtor-in-possession accounts. As a result, a number of the prepetition payroll

---

2 Most of the employees are paid on an hourly basis, and therefore the precise amount of the payroll obligation varies from one period to another.

3 Payroll checks issued on that Friday covered wages accrued through the preceding Sunday, September 27.

checks were dishonored by the Debtors' prepetition banks or were not presented prior to the closure of the corresponding accounts (these dishonored and unpresented checks are referred to herein collectively as the "Dishonored Prepetition Paychecks"). The Debtors estimate that the amount of prepetition wages owing as a result of Dishonored Prepetition Paychecks is $21,880.71.

23. The Debtors' first postpetition payroll date is Friday, October 16, 2009. The two-week earning period associated with this payroll includes the Petition Date, and runs from September 28 through October 11, 2009 (the "Straddle Period"). Of the Debtors' anticipated payroll obligations and payroll tax obligations pertaining to the Straddle Period, roughly half will prepetition obligations (the Petition Date is the eighth day of the fourteen-day Straddle Period). Attached hereto as Exhibit A is an estimate of the Operating Companies' total payroll obligations for the Straddle Period. Attached hereto as Exhibit B is an estimate of the Operating Companies' payroll obligations broken down by store location.

**F.**    **Accrued Vacation**

24. The Operating Companies provide their full-time employees with one (1) week of paid vacation leave upon the completion of one year of continuous employment, and two (2) weeks upon completion of three (3) years of continuous employment. The Debtors encourage employees to take vacation, but have historically honored requests for pay-in-lieu. The Debtors' prepetition vacation leave policies are referred to herein collectively as the "Vacation Policy."

G.     **Reimbursable Business Expenses**

25.     Some of the Debtors' employees incur certain expenses in performing their various work-related duties and responsibilities (the "Reimbursable Business Expenses").  The Debtors, in the ordinary course, reimburse those employees for such expenses.  As of the Petition Date, some Reimbursable Business Expenses remained unpaid and/or unsubmitted.  Although it is difficult for the Debtors to determine the amount of ordinary-course Reimbursable Business Expenses at any particular time, the Debtors estimate these obligations to be less than $500 as of the Petition Date. (This amount does not include several thousands of dollars in prepetition expense reimbursements owing to Mr. Dallas Hendrix, the direct or indirect owner of the Debtors, for business expenses charged to his personal credit card.  The Debtors are not seeking approval to reimburse Mr. Hendrix for these charges at this time.)

H.     **Payroll Deductions & Matching Obligations**

26.     In the ordinary course of its business, the Debtors withhold certain amounts from their employees' paychecks to cover various items, including applicable state, federal, or local income taxes and social security and Medicare taxes for which the Debtors deduct funds from an employee's paycheck to then remit to a third party (collectively, the "Deductions").  In addition, the Debtors are required to make matching payments from their own funds on account of social security and Medicare taxes and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to certain taxing authorities for, among other things, state and federal unemployment insurance ("Matching Funds," and together with the Deductions, the "Payroll Taxes").  The total amount of Matching Funds obligations pertaining to the Straddle Period is approximately $6,227.00, and of this amount, approximately half (or $3,113.50) represents prepetition obligations.

**I.**     **Employee Benefits Plans**

27.     In the ordinary course of their business, the Operating Companies have established various medical and other insurance benefit plans (the "Health and Welfare Plans") for their respective employees.  The Debtors believe that the aggregate amount of obligations accrued prepetition under the Health and Welfare Plans and not yet paid does not exceed $3,375.74.

**J.**     **Payment of Prepetition Payroll Obligations Is Essential**

28.     The continued operation of the Debtors' businesses and their successful reorganization depends largely upon the retention of the services of these employees and the maintenance of employee morale and cooperation.  In some cases, nonpayment of employee claims would render the Debtors' employees unable to pay their daily living expenses, all with a deleterious effect on employee morale and retention.  Consequently, it is critical that the Debtors be authorized to satisfy their employee-related obligations and continue their employee plans, policies, and programs as they were in effect on the Petition Date.

29.     It would also be inequitable to require the Debtors' employees to bear personally the cost of any business expenses they incurred prepetition for the benefit of the Debtors with the understanding that they would be promptly reimbursed.

30.     Payment of all employee obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors and their respective estates, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

**RELIEF REQUESTED**

31.     Pursuant to Sections 105(a), 363(b), 503(b) and 507(a) of the Bankruptcy Code, the Debtors request authorization to honor and pay, in their sole discretion, obligations relating to

wages, salary, and compensation for its employees and payroll taxes owed to various taxing authorities, certain expense reimbursements, and amounts due under various benefit plans and policies for its employees, up to the amount of $10,950 per employee. The Debtors also seek authorization to continue to honor their practices, programs, and policies for their employees as in effect as of the Petition Date, and as they may be modified, amended, or supplemented from time to time in the ordinary course of business. The Debtors also seek authorization to pay all costs incident to the foregoing, as well as authorization to their postpetition banks to receive, honor, process, and pay any checks drawn (or electronic transfers requested) in connection therewith (such as, for example, the Dishonored Prepetition Paychecks).

32. By this Motion, none of the Debtors are seeking authority to pay prepetition compensation (including all of the categories of compensation covered by Section 507(a)(4) and (5)) in excess of $10,950.00 to any employee. Further, none of the Debtors are seeking in this Motion to alter their compensation, vacation, or other employee benefit policies, nor to assume them, to the extent they may be deemed executory contracts. This Motion is intended to address only those limited obligations that arose under existing policies prepetition and had not been satisfied as of the Petition Date.

## LAW AND ARGUMENT

### A. Generally

33. Pursuant to section 503(b)(1), a debtor may incur, and the court, after notice and a hearing, must allow as administrative expenses, the "actual, necessary costs and expenses of preserving the estate." In addition, pursuant to section 363(b), a debtor may, in the exercise of its sound business judgment and after notice and a hearing, use property of the estate outside the ordinary course of business.

34.     Furthermore, to supplement these explicit powers, section 105(a) empowers this Court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." Bankruptcy courts in this Circuit have used this power to authorize the payment of prepetition debt when payment is needed to facilitate the rehabilitation of the debtor. *See, e.g., In re American Plumbing & Mechanical, Inc.*, 323 B.R. 442, 459 (Bankr. W.D. Tex. 2005) ("Honoring certain pre-petition employee wage and benefit claims early in the case was justified for the same reason as was approving certain critical vendor payments—the detriment to pro rata distribution was outweighed by the need to maintain the reorganization process, seen as the only route likely to lead to paying unsecured creditors anything at all."); *see also In re Tusa-Expo Holdings, Inc.*, 2008 WL 4857954 (Bankr. N.D. Tex. 2008); *In re CEI Roofing, Inc.*, 315 B.R. 50 (Bankr. N.D. Tex. 2004); *In re Equalnet Communication Corp.*, 258 B.R. 368, 370-71 (Bankr. S.D. Tex. 2000); *In re Just for Feet, Inc.,* 242 B.R. 821, 824 (D. Del. 1999).

35.     The Debtors submit that the use of estate funds to honor their prepetition obligations to employees is permitted by sections 503(b)(1) and 363(b) as a necessary cost of preserving the Debtors' respective estates. Nonpayment of these obligations would significantly impair employee morale and cause employees to leave, all of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the estates.

36.     In addition, the payment of these benefits is justified because such benefits are granted a right to priority payment under the Code. Under Section 507(a)(4), each employee may be granted a priority claim for:

allowed unsecured claims, but only to the extent of $10,950 for each individual or corporation, as the case may be, earned within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for

(A) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual; [.]

U.S.C. § 507(a)(4)(A). Similarly, section 507(a)(5) affords priority status for employee claims for contributions to certain employee benefits plans to the extent of $10,950 per employee, less any amount paid pursuant to section 507(a)(4). The Debtors believe that most or all of their prepetition obligations to employees constitute priority claims under sections 507(a)(4) and (5). As priority claims, such claims carry a high likelihood that they will ultimately be paid, and thus it is also likely that the payment of such claims sooner rather than later will not be prejudicial to any creditor.

37.   To the extent that the Debtors have deducted Payroll Taxes from their employees' paychecks, these collections are held in trust for the benefit of the employees, and the use of such funds to pay other creditors is generally prohibited. *See In re Robertson*, 354 B.R. 445 (Bankr. W.D. Tex. 2006); *Staff IT, Inc. v. U.S.,* 2006 WL 314440 (S.D. Tex. 2006). The funds held to pay the Payroll Taxes are not beneficially owned by the Debtors, and therefore payment of the Payroll Taxes will not prejudice any of the Debtors' general unsecured creditors.

## B.   Impact of New Rule 6003 on Payment of Prepetition Obligations

38.   Rule 6003 (effective December 1, 2007) permits relief to be granted during the first 20 days of a bankruptcy case only if necessary to avoid immediate and irreparable harm in the following contexts: (1) retention of counsel or other professionals, (2) a motion to use, sell, or lease estate property (other than an interim motion to use cash collateral under Rule 4001), (3) a motion to incur debt or to pay a prepetition debt (other than an interim motion for debtor-in-possession financing under Rule 4001), and (4) a motion to assume or assign an executory

contract or unexpired lease.  The Advisory Committee notes explain that the purpose of the new rule is to permit full and close consideration of matters that may have a fundamental impact on the case.  The standard of review is similar to the traditional standard employed under Rule 4001(b)(2) and (c)(2).

39.    It is apparent that the Debtors' honoring of their prepetition obligations to employees (or to taxing authorities or benefit providers, for the benefit of the Debtors' employees) is necessary to avoid immediate and irreparable harm to the Debtors' businesses, and that the requirements of Rule 6003 are satisfied.  As discussed throughout this Motion, the retention and morale of the Debtors' employees is vital to the Debtors' reorganization efforts. The Debtors seek authorization to pay a narrowly tailored set of liabilities to or on behalf of persons essential to the Debtors' business, and most of such liabilities are either entitled to priority status, are paid from "trust funds," or both.  The Debtors submit that honoring the prepetition obligations to their employees is necessary to avoid immediate and irreparable harm to the estates, and that the requirements of Rule 6003 and the current judicial standards for granting such relief are therefore satisfied.

WHEREFORE, the Debtors pray that the Court enter an order, pursuant to sections 105(a), 363(b), 503 and 507 of the Bankruptcy Code, (i) authorizing the Debtors, in their sole discretion and subject to availability of funds, to pay all prepetition obligations to or on behalf of their employees, subject to the statutory limitation of $10,950 with respect to wages and certain benefits, including issuance of checks to replace the Dishonored Prepetition Paychecks; (ii) authorizing and directing the Debtors' banks to process checks and fund transfer requests relating to any payments approved in connection herewith as to which checks were issued (or transfers requested) before the Petition Date, but which had not cleared as of that date;

(iii) waiving the requirements under Bankruptcy Rule 6004(a) and the ten-day stay provided by Rule 6004(h); and (iv) granting such other legal and equitable relief to which the Debtors may be entitled.

      Respectfully submitted this 7th day of October, 2009.

SELMAN MUNSON & LERNER, P.C.


By:  /s/ James M. Schober_____
      James M. Schober
      TBA No. 24004907
      jschober@selmanmunson.com
      Christopher D. Johnson
      TBA No. 24012913
      cjohnson@selmanmunson.com
Barton Oaks Plaza IV, Suite 200
901 S. MoPac Expressway
Austin, Texas 78746
Telephone:      (512) 505-5955
Facsimile:      (512) 505-5956

PROPOSED ATTORNEYS FOR DEBTORS AND DEBTORS-IN-POSSESSION

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of October, 2009, I caused to be served a true and correct copy of the foregoing pleading to the parties on the attached service list via U.S. mail and, where an e-mail address is indicated on the attached list, by e-mail.


  /s/ James M. Schober
James M. Schober

## SERVICE LIST

**Debtors**

U-First, L.L.C.
D. Hendrix, L.L.C.
J & J Powermart, L.L.C.
1525 West Koenig Ln.
Austin, TX  78756

**U.S. Trustee**

United States Trustee
903 San Jacinto, Ste. 230
Austin, TX  78701
Deborah.A.Bynum@usdoj.gov

**Secured Creditors**

Capmark Finance/GMAC
Attn: Mark Averett
3 Ravinia Dr., Ste. 200
Atlanta, GA  30346

Security State Bank and Trust
P.O. Box 1154
Dripping Springs, TX 78620

Wells Fargo Bank Texas, NA
P.O. Box 659713
San Antonio, TX 78265

**State Agencies**

FmHA
101 South Main, Ste. 102
Temple, TX  76501

Texas State ASCS/CCC
P.O. Box 2900
College Station, TX  77841

Internal Revenue Service
P.O. Box 21126
Philadelphia, PA  19114

United States Department of Justice
601 N. W. Loop 410, Ste. 600
San Antonio, TX  78216

State Comptroller of Public Accounts
Revenue Accounting Division – Bankruptcy
Section
P.O. Box 13528
Austin, TX  78711

Texas Employment Commission
TEC Building – Bankruptcy
101 East 15th Street
Austin, TX  78778

Texas Alcohol Beverage Commission
Licenses and Permits Division
P.O. Box 13127
Austin, TX  78711-3127

**Creditors Holding 20 Largest Unsecured
Claims (All Debtors)**

Metro IV, Ltd.
c/o Molly Mayhall
Barnett & Garcia
211 RR 20 South, Ste. 110
Austin, TX  78734

William Stewart
18914 Hwy 87
Lubbock, TX  79423

GE Capital
P.O. Box 740423
Atlanta, GA  30374-0423

GE Capital Electric Capital Corp
P.O. Box 848319
Dallas, TX  75284-8319

Popeyes Texas Partners, LP
Attn: Christopher Phipps
121 Spear St., Ste. 250
San Francisco, CA 94105

Inland America Retail Mgt., LLC
12340 Jones Rd., Ste. 290
Houston, TX 77070

Farmers Branch/Midway Partners, LP
Attn: Christopher Phipps
121 Spear St., Ste. 250
San Francisco, CA 94105

Estate of Louis Widen
c/o Anna Marie Speir
#15 Las Brisas
Austin, TX  78746

Gary & Becker, P.C.
900 West Ave.
Austin, TX  78701-2210

Summerwood Partners
22416 I 30, Ste. 1000
Landers Plaza
Bryant Arkansas  70222

PFG
P.O. Box 951641
Dallas, TX  75395-1641

Tyson Foods
P.O. Box 915143
Dallas, TX  75391-5143

Tyson Foods
P.O. Box 915143
Dallas, TX  75391-5143

Patrick Villareal
4313 Dorothy
Bellaire, TX  77401

Pepsi
P.O. Box 841828
Dallas, TX  75284-1828

City of Austin Utilities
P.O. Box 2267
Austin, TX  78783-2267

JPDH, LLC
1525 W. Koenig Ln.
Austin, TX  78756

AFC Enterprises - Ad Fund
Popeyes Ad Fund
P.O. Box 406596
Atlanta, GA  30384-6596

TXU Electric
P.O. Box 660409
Dallas, TX  75266-0409

R W Morgan Electric
4402 South Congress, Ste. 108
Austin, TX  78745

Wand Corporation
7593 Corporate Way
Eden Prairie, MN  55344

Aramark Uniform Services
P.O. Box 36028
Dallas, TX  75235

K & M Enviromental Controls LLC
511 S. Lariat Circle
Dripping Springs, TX  78620

Windemere Utility Company
P.O. Box 650784
Dallas, TX  75265-0784

National Liquids
P.O. Box 1377
Buda, TX  78610

Security Self Storage
10210 N. Lamar Blvd.
Austin, TX  78753

JL Powers & Associates
1280 Drifting Wind Drive
Dripping Springs, TX  78620

AFC Enterprises
22137 Network Place
Chicago, IL  60673-1221

B&G Plumbing
P.O. Box 1477
Kyle, TX  78640-1477

AT&T
P.O. Box 5001
Carol Stream, IL  60197-5001

Ultrafryer Systems
302 Spencer Lane
P.O. Box 5369
San Antonio, TX  78201

A Tex Pest Control
124 Vicksburg Loop
Elgin, TX  78621

NuCo2 LLC
P.O. Box 9011
Stuart, FL  34995-9011

Liquid Environmental Solutions of Texas
P.O. Box 671064, Dept. 4
Dallas, TX  75267

**Parties Requesting Service**

David L. Woods
McGuire, Craddock & Strother, PC
Lincoln Plaza
500 North Akard, Ste. 3550
Dallas, TX  75201
dwoods@mcslaw.com